Please all rise. Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson presiding. Please be seated. Your honors, the final case on the docket this morning is 2-21-0718, American Academy of Pediatrics, plaintiff appellant. The Illinois Department of Revenue, Lake Park High School District No. 108, Itasca Elementary School District No. 10, Itasca Fire Protection District, Itasca Park District, and Itasca Community Library, defendants appellees. Arguing for the appellant, Mr. David C. Wittenstaff. Arguing for the appellee, Lake Park High School District No. 108, Mr. Scott L. Ginsberg. Arguing for the appellee, Illinois Department of Revenue, Ms. Bridget D. Bautista. Good morning, counsel. You note that Justice Hudson is on video, or on Zoom, and we found out earlier today that he can be heard and he can interrupt you well, so just kind of keep that in mind. And Justice Jurgensen, you? Yeah, I just want to apologize. I have an eye infection and the light just aggravates it, so I didn't mean to be disrespectful, but it helps. Thank you. All right, so now that we have the housekeeping all done, Mr. Blinkenstaff, if you are ready, you may proceed. Thank you, Your Honor. Good morning, counsel. May it please the Court. And you're going to need to pick that up just a bit. Okay, is that better? Better, yes. I want to make sure Justice Hudson can hear you. As do I, Your Honor. Thank you. Okay, thank you, Your Honor. May it please the Court. Your Honors, in this case, the Department of Revenue concluded that the American Academy of Pediatrics is not a charity. That decision contradicts Illinois' Supreme Court precedent about what it means to be a charity. It contradicts 60-plus years of the Department's own assessment with respect to the Academy itself, and it disregards the unrebutted evidence of what the Academy does. Well, isn't it both the Academy and the property that must qualify under the statute? Yes, Your Honor. Okay. You have to have a charity, and the property has to be used for the charitable purpose. That's correct. So the Department's decision here was clear and should be reversed. Now, if you have a child in your life, that child has benefited from the American Academy of Pediatrics' work. It has – I'm sorry, I didn't mean to cut you off. This is a good question – or a good place to start, rather. Yes, our child, if our physician is a member. What about if our child is the patient of a physician who is not a member of the Academy? Your Honor, it's not only doctors. So let me answer the question in a couple of ways. One is the American Academy of Pediatrics, what its purpose is, what the ALJ found its work is, is to identify issues that affect children's health, study those issues, make recommendations, and then disseminate that information broadly, advocate for children. The dissemination part of it is what Your Honor is asking about. Some of that, some of those channels are through member pediatricians. Many are not. The Academy runs both educational seminars for its own members, but also for non-members, and maybe more importantly from a just breadth of scope, breadth of reaching the public standpoint, it operates a website that in 2017, which is the tax year at issue here, had 25 million unique visitors to it, and that number was more than twice as high two years later. So that website is a website that parents or any caregiver or any physician or any policymaker can go on, and there's a whole list. It goes on and on and on. It's amply discussed in the trial court record here. The ALJ record, of all the symptoms that a child might be experiencing, depending on the age of life, the stage of life, the phenomenon might be occurring. So it could be the middle of the night. It could be 2 in the morning, and the parent can go on the website and look up and see, all right, I've got these symptoms, you know, what should I do? And that might be go to the ER. It might be call a doctor. But it doesn't have to be call a doctor from the American Academy of Pediatrics. The number that you cited is a pretty big number. Do we know how many of those were public members as opposed to member inquiries? Thank you. We don't, Your Honor, but there are only 67,000, and the number varies a little bit in the record, but roughly that number of members of the academy. And so it couldn't have been only them. These are 25 million unique visitors as opposed to visits port period. And I draw that distinction because the number was about 40 million just visits. So some people repeated. But in terms of unique visitors, 25 million was the number for that year. It was closer to 70 million in 2019. Both those pieces of information are in the record. What about access to the building? I realize that is a very good factor, but what about access to the building? Can the public access the building freely? Well, the building is basically the administrative headquarters for the organization. So there's not a lot for the public there. There is a library on site that if you call up and make an appointment, you could get access to, but it's not regularly open. But the reason I emphasize the website is that, you know, and we've seen some of the cases, the emphasis on public access to a space, and many of those cases come from a pre-Internet period. In modern times, the Internet reaches so many more people. Is your library on the Internet? I'm sorry? I don't think it is, Your Honor. What's on the Internet is there are a couple of different websites that the Academy maintains. One of them is called aap.org, which is more directed to physicians and members, although the public can access that as well. But it's more sort of on the technical side. And then healthychildren.org is the website I was referring to that had the many millions of visitors. And that one, those are designed differently to reach different audiences. The purpose of healthychildren.org is to reach lay people, families, parents. Can I ask you, though? I get it. I understand what the websites are for. Okay. My question is this. How does that have any relevance to the property? Well, the property is where all the work is done that the Academy both, I mean, this is not only about a website. We've been talking about that. But the website is run from there, is managed from there. The work that goes on that, so the website basically collects information and provides advice. And that process of gathering advice, of developing recommendations, researching is all coordinated through the central headquarters. I don't want to nitpick here, but there's a difference between creating information and simply, I'll say, warehousing it. I agree 100%. What is done at this property? Well, so if you think about the Academy as an organization that studies issues, comes up with evidence-based recommendations, and then disseminates that information to the public. That's how I would describe what the Academy does. All those functions occur at the property. So you have on-site a media center that helps prepare public service announcements that you may have heard on the radio or their YouTube videos that the Academy produces. The website we've talked about is administered from there. But the content that goes on the website is not just pulled from other websites. The content is what the Academy generates in order to translate, you know, what in some cases is technical medical information to the broader audience of the public. And it's your position that that is done at your facility? A lot of it is done at the facility. Some of it is done by the volunteer members, because the members not only pay dues, but also participate in the Academy's work. So some of them, you know, are wherever they are working. They're practicing and they're contributing to. And they go there and do this work? Sometimes they do. But, of course, they work in their homes as well. But the purpose of the Academy's administrative facility is to run this operation. So, you know, they have to gather up and coordinate all of that and then disseminate the information to the broader public, policymaking, policyholder contacts and things like that. Counsel, if I can interject a question here. As I understand it, to qualify for a property tax exemption, the statute requires, first of all, that the property be used exclusively for charitable purpose. Yes. How is the property being used exclusively for charitable purpose? That's, I mean, the only thing that happens on this site, Your Honor, is, and I hope I'm looking in your direction answering the question. The only thing that happens on this site is the coordination I've been talking about, the research, the development of public service announcements. There's, I think I said research. There's coordination of all these members to do the volunteer work of the Academy. Everything that happens there is for the purpose of developing policies to improve children's lives and then disseminating that information, trying to make it happen. So that's the central nerve center. That's all there really is except for a D.C. office that interfaces with the federal government, which is very small in comparison. There are about 475 folks in Itasca, and it's only about 17 in D.C. And that's the entire Academy. So the work that's being done that results in all the benefits to all of us, campaigns for awareness and changes in the way that we do things, all emanates from this facility. Well, you may make the argument it has charitable purpose in mind, but how do you say it's used exclusively for charitable purpose when it's the administrative headquarters of the Academy? Well, I mean, first of all, the word exclusive has been interpreted to mean primary, but in this case nothing else happens there other than the activities of the Academy itself. It is a headquarters, but that's where the Academy does its work. That's what it does. And there's case law that says that if you've got the administrative headquarters of an organization, that is a charitable purpose if what it is doing is charitable. So is it owned by an institution of public charity? Well, it is an institution of public charity, and that's where its headquarters is. So that's where it is performing its service to the public. Now, you said something interesting that had some intuitive appeal at the beginning. You said for many years it was considered and given tax-exempt status. Is that really relevant to the issue today? What happened in the past? I would say to me it is, and I'll explain why. The Academy has been exempt from Illinois property tax for at least 60 years. That's a stipulated fact in this record. Is that determination by past versions of the Department binding on this Court? It is not. It's also not binding on the Department. But it does show that the Department in this case viewed the Academy through the wrong lens. That's really the only way you could reach the result that was reached here. You have what everybody agrees is the same legal standard. You have the same activities that the Academy is doing. In fact, there's actually more of a – there's a better record for the Academy here, given the development of the website and that kind of technology to reach people than there was in the past. And so why are we reaching a different conclusion about what this organization is? Administrative agencies obviously have some deference, but they also have to have some basic rationality. We've never had an explanation in this case of what changed. So is it dispositive in binding that there was an exemption for 60 years? No, but it sure makes you wonder what happened here. The law makes it clear that statutory exemptions are always construed narrowly and strictly in favor of taxation. How does that bear on the issue there? Well, Your Honor, we have a burden here of a clear, convincing standard to satisfy the standard, the statutory standard, which has then been spelled out in numerous decisions. And I think everybody agrees in this case on what those – what the factors are that need to be considered. But it's our burden by clear and convincing evidence to show that we satisfy that test. We have done that. The unrebutted evidence here – and we could go through the factors, Your Honor, but the short version of what the test is looking at is does this organization provide a public benefit? That's effectively what's going on. I mean, obviously, that has to be the predominant use of the property on the organization, but that's ultimately what the test boils down to. And in this case, that's an easy yes. This is an organization that literally changes lives, saves lives. And that's what it goes to work to do every day. And the fact that this organization changes lives and the organization's information, I guess, changes lives, that could go to the tax identity of the organization. But that does not necessarily flow into the building, does it? Well, the case – I'll point you, Your Honor, to the Evangelical Teacher Training Association, I think it was called. This is a case from this district from about 40 years ago. We weren't here. Well, neither was I. Did you say 40 years ago? It was 1983, so about – yeah. Okay. So that's a case in which there was an organization that was a membership organization. And I know I'm passing my time. I hope I can answer your question. Go ahead. You're answering that question. It was an organization of – a membership organization in the Evangelical religious organization, but the court viewed the charitable test as similar. And this organization had 200 or so members. And what it did was to go out and teach and, you know, basically it was teaching the teachers, essentially. It was a teacher training academy. So, you know, they would go off-site to do that, but the headquarters was deemed to be exempt because the function of the organization was to go and teach and educate folks. And there are other examples of that. So the case – I mean, yes, there are certainly many examples of where the space itself is, you know, is being offered to the public, right? It's a venue for art or for dance or for a community hall, those kinds of things. Those are common in the cases. But as in the College of Surgeons case from the Supreme Court, you know, a lot of what this organization does and that organization did was to educate people somewhere else. I mean, educate them out and sort of send information out into the world. And that, you know, the use of a property to accomplish a charitable purpose is a charitable use. All right, Justice Jorgensen, do you have any other questions? No, I do not. Thank you. Justice Hudson, anything else? I do not. Thank you. All right, you'll have an opportunity to reply, sir. Thank you. All right, it looks like you're going to get up first, counsel, so we will let the school districts respond first and then the Department of Revenue. Test this. He's much taller than I am, so let me make sure. Yes, let's get it down where we can hear you. Thank you. Good morning, Your Honors, and may it please the Court. So counsel continues to make one argument that I'd like to address, which is the prior exempt use or the prior exemption that AAP had been given by. That is not binding on us. That's correct. And it's worth noting that when the testimony is that there has been 60 years of recognition as exemption by the Department of Revenue, what really we're talking about is a decision that was made around 1985, about 40 years ago. And since that time, this has not been revisited by any agency to our knowledge. What the process works is that under Section 1510 of the Property Tax Code, the recipient of a charitable property tax exemption must annually certify that there hasn't been a change of use. The Department of Revenue or the Board of Review, as the case may be, does not revisit. They don't look at the financial records. They don't analyze information or how properties or uses have evolved over the time since the initial determination. Well, I assume Ms. DiPartista will talk about that a little more. So let's talk about your school districts. Sure. So the school districts, I represent five taxing districts in Itasca, Illinois, or the Itasca area, that received notice of this tax objection and intervened. And we filed an objection to the exemption because based upon the new record, and when they purchased a new property, they had to complete a new property tax exemption application. And that exemption application came with documentary information, including the sources of revenue and the activities they perform on the property. And it was our conclusion that based upon the evolution of the law in the Provena v. Department of Revenue case from 2010, the Supreme Court looked at an entity that we found to be very similar and found that the entity was not exempt. Now, in that case, the entity was a hospital. And that hospital, you know, as with the subject property, the hospital, hospitals in general, are historically considered exempt entities under the charitable arm of the property tax code. Hospitals are 501c3s under the federal income tax code, as the academy is here. Hospitals receive sales tax exemptions, as the properties do here. But the Provena case court was very careful to explain that that's not the standard for a property tax exemption in Illinois. Property tax exemptions in Illinois require a much higher burden, is a strong burden in favor of taxation and a strong burden against exemption. And that's because of the harm that an exemption causes to the rest of the tax base and to the taxing districts themselves. The harm to the taxing districts is that one of the more valuable properties in the county, or at least in the Itasca area, will not be paying property taxes that generate revenue for the schools and the fire district and the park district, presumably who are going to service the individuals that are employed at the headquarters. One of the Provena cases, and unfortunately, in a situation like this, you have a lot of Corzine cases because he was the assessor, and you have a lot of Provena. So in one of them, and I will pose it as that, they made a significant record of who they served in the hospital. And the court found that their service of the poor was kind of the last at the end of their, you know, at the end of the line. If you just couldn't pay it, they weren't going to turn you away, but they certainly would have preferred you paid it. So how does that relate to this case? We don't have any sort of record of who pays, who doesn't pay, particularly in this case, do we? We do, because if you look at the, it's called a Form 990. It's an annual filing by the Department of Revenue, or I think it's a federal annual filing, and the nonprofits, they come in and they generate and they explain how they receive their money and how they spend their money. Well, 68%, I believe is the number of their revenue that they receive, comes from the sale of periodicals, membership dues, the provision of continuing education courses. And so there's a long line of testimony at trial regarding are those services available to those that are unable to pay? And there was a pretty compelling line of testimony regarding, for instance, a pediatrician who was unable to pay to be a member of the American Academy of Pediatrics. And the conclusion was that not only, I mean, it was one of the most stringent waiver requirements I've ever seen in any kind of organization. You have to show severe financial or medical emergency with a doctor's note, and it's got to be a two-thirds approval by the board. This is just to have your annual membership dues waived. Similarly, you need, there's no process by which you can receive a waiver of fees for the periodicals, which is a very large portion of the job that AAP performs is that they publish periodicals. And they sell those periodicals to the doctors that read the periodicals and use what they've learned from the periodicals to practice on their patients, which is really the end result of how the academy receives, you know, is what they're claiming to be charity, is better educated doctors make the world a better place. But those periodicals go to the members first, correct? They go to the members for, well, they go to the members for free or at a discounted price. Any non-member who would like to access those periodicals, which are clinic-driven, they're not for the public. But to the extent that anyone other than members of the AAP would like to access those periodicals, they pay full price, a higher price than the members, and there's no policy for a waiver. They said they'd be open to a policy for a waiver, but that's never come up before. Similarly, with their annual convention, which was a very large source of how they spend their money, is their expenditures go to this annual convention that's in a location like an Orlando or a Vegas each year, and there's no process by which members of the public that want to attend this convention can get a waiver or a discount. Similar with their continuing education courses, so, you know, when you look at how they spend their money and how they receive their money, it's very much driven like a for-profit organization. You know, we talked a little bit about the healthychildren.org, which is the website, which they consider to be a they describe it as a consumer-facing website. But, you know, just the idea that we were talking so much about that here today shows how the list of activities that they claim to be charitable is just a very small portion of what they do. Well, let's talk, and that might go to their 501C federal tax exemption, but how do any of those things, I assume is your argument, go to the building, to the property? Well, that's right. The testimony was that the property employs, there are three people on the property that run all of their websites, and that's out of the 475 employees at AAP. So if you just want to do simple math, that's much less than 1% of their staff at the AAP headquarters is dedicated to generating or to operating that website. And similarly, the entity itself, as an institute of public charity, receives, I think, somewhere around, over $100 million, and the testimony was about $600,000 of their annual budget goes to generating these websites. And I assume that includes the employee salaries in addition to the nuts and bolts that it takes to operate a website. So, you know, as with Provena, they provided a laundry list of activities that they perform, but as with Provena, those activities can be seen as a method to generate goodwill and publicity, similar to a for-profit organization, and really constituted a very small percentage of their overall activity. Thank you very much, unless there's any further questions. Justice Hudson, do you have any questions of counsel? Has the plaintiff ever issued any stock or have any shareholders? Not so far, no. The answer is no. I have no other questions. Is that it, Justice Hudson? You seem to be thinking. Well, I'm always trying to think, but not at the moment, no. Okay, thank you. Thank you very much. We will allow the Department of Revenue to proceed at this time. And I apologize if I mispronounced your name. You said it correctly, Your Honor. Good morning, Your Honors. May it please the Court, Assistant Attorney General Bridget D. Batista, on behalf of the Illinois Department of Revenue. Your Honor, this case, of course, concerns analysis of the cause and factors, but overlaying this analysis are two guiding principles that the Court is familiar with that bear repeating, which are the standard of review here being clear error. The Court on Administrative Review does not step in the shoes of the agency here and decide on the first instance whether the Academy is entitled to an exemption, but rather reviews the decision to determine if there was a clear error here necessitating reversal, if it's left with a definite and firm conviction that a reversal is required. This decision is not a candidate for that, given the meticulous engagement with the record by the Director here, the analogizing and distinguishing of the pertinent case law at issue here. The second guiding principle is, in Illinois, the way exemptions are treated. They are construed narrowly in favor of taxation. And the burden on the taxpayer is a very heavy one to show entitlement to an exemption. And that is not arbitrary. It is because this revenue is a principal source of revenue for local governments. And so, again, that burden is a clear and convincing burden. And that's important when we go to the factors, and some of the Court's questioning today is really homing in on this key factor, which outlines as the sixth factor, which is the use. As the priority opinion in Provena noted, it is the sine qua non of the exemption. It is embodied not only in the Constitution, but in the statute itself, that you must show the property is exclusively and that is primarily used for charitable purposes. And does it matter? I mean, both of you have generally said that this is a very large chunk of this area's potential revenue. Do we know the percentage of that chunk at this time? Just so I understand your question, the percentage of the use of the building? You know, the percentage of the money that would be, the percentage of money going to this local government area with the tax. I do not have that figure. However, just going back to the use of the building, in our department's brief, we note that there was not this clear and convincing standard met here through evidence of how the actual building is used. And that's actually one of the first arguments in our brief. And notably, in the reply, there was no response to that, how concretely this building is being used. And when we look to the evidence, we see only 1 to 2 percent of members visit the property. No part of the building is dedicated to public use. Only six employees are board-certified pediatrician. And in terms of the advocacy efforts, of course, we know there are these three pillars that the Academy has identified, education, policymaking, and advocacy, as what they claim is charitable. But the advocacy efforts, we see there's a Washington, D.C., office, so the federal-level advocacy is likely done there and certainly has not been shown to be done at the headquarters here. And also you have these local state branches, which the Academy admits are independent of the headquarters. So state initiatives, in terms of advocacy, will be handled at that level. They simply have not met this clear and convincing standard for demonstrating the use of the property being primarily charitable. Not even identifying what the uses are, but also that it's primarily charitable. What makes it primarily? I mean, we know exclusive doesn't mean 100 percent anymore, but what does primarily mean? Is it 90 percent, 75, 50, 51? You know, I don't know that there's a concrete answer to that, Your Honor, but I think what needs to be shown is how this property is being used. And even that question, I don't know, is being distinctly answered here. We see that their marketing and administrative functions of the office, but how concretely is this building being used, is this headquarters, this property being used? It is not an income tax exemption. It is not a sales and use exemption. It is a property tax exemption, so we need to have it be tied to the property. Just briefly on the remaining factors, the first factor, you know, benefiting an indefinite number of individuals, it was not clear error for the director to see that the primary beneficiaries here are the pediatricians. And, indeed, we see that the benefits to pediatricians are numerous. We have the FAAP designation. They're part of the member directory. They have networking and placement on committees. And those factors are important, too, when we consider the website, the HealthyChildren.org. That website contains the member directory. It encourages people going to that website to obtain a pediatrician who has that FAAP distinction. So as the director found, there is this symbiotic relationship between the website and promoting its pediatricians. And in addition to that, as was ---- Does it get any revenue from that promotion? In terms of revenue from the website, the record shows that it links to its shop AAP link, which is responsible for 5% of its revenue for publication sales. And also we see from the record, from the revenue, as my co-counsel mentioned, the 4990 is illustrative here. That's on the record 2107, the statement of revenue, as well as 2108 with their expenses. In terms of revenue, online and print ad revenue constitute $10 million worth of their revenue. So this really is being operated in a more businesslike fashion. And to Justice Jorgenson's question, the library, is there access to the periodicals, to the literature on the website for free? Far from that, it's encouraging individuals to purchase those publications on that website. What about archives? Are they available on their website? I'm sorry? Archives, like older periodicals. To my knowledge, that is for purchase. Perhaps my opposing counsel can speak more to that. But we do know that there is an effort to sell publications through this website. The remaining factors, you know, the third factor is very important here, that the funds are not derived mainly from charity. 68% of them are derived from program services, like I had mentioned, publication sales, ad sales. The fourth factor, the charity is not available to all who need and apply, as my co-counsel discussed. There are barriers. No set fee waiver with respect to the fifth factor available to pediatricians. And then also there has not been a clear and convincing showing with respect to the no private gain, which is the second portion of the fourth factor, that there was not a, just to complete my thought there, the availability that there was not a presentation of the compensation studies to show that these salaries were in line with the market standard. Justice Hudson, anything of counsel? I do not. Justice Jorgensen? I do not. Thank you. We would ask for the court to affirm the director. Thank you, Your Honor.  All right. Mr. Blinken, staff. Thank you, Your Honor. The idea that things like the designation of a doctor as a fellow. Counsel, I'm just going to ask you to put that back up again. Sorry. Yes. Justice Hudson, can you hear? Yes, I can. Okay. Okay. I'm sorry, Your Honor. The idea that the designation of somebody as a fellow of the Academy is, and those kinds of incidental member benefits outweighs the benefit of this organization to the public, is exactly where the department went wrong here. That's what I heard counsel just say. That's not accurate. The analogy to Provena is also way off base. There was no change in the law as a result of Provena. It was a plurality decision. Cases since have said that the standard remains the same. That case involved a situation where a hospital was charging just about everybody, but about 1% of patients got free services or reduced fee. And then there were about a, sorry, 1% of its revenues came from that, which represented about a quarter of a percent of the people who went to the hospital. That's not anything like what's going on here. We've listed in our brief on pages 22 and 23 a whole laundry list of activities that the Academy engages in that are for the public. There's no barrier to access to that information and those recommendations, which help any parent or any person who wants to go and look any time of day. So it's a massive effort to try to make children healthier and safer. That's what the Academy does every day. And that's all given away for free with no strings attached, no barrier to entry. Other than the website of those, of that laundry list as you called it, which ones are performed on site? Well, the whole, and I want to thank you for asking that question, because I did want to add a case to the one I cited earlier, which is also an evangelical case, which might have been my confusion, which is Evangelical Hospital Association, I believe also from this district from 1984, and that's on the issue of the use of the building as the headquarters of an organization. That was an administrative sort of center place for charities that did work in other facilities as well, and that headquarters was deemed to be a charity. And now I've forgotten your question, Your Honor. I'm sorry. Well, other than the website, what is, what do you do on site? Yes, thank you. I forgot the question too. I'm sorry, Your Honor. I didn't, I got off on a detour. So this organization basically generates evidence-based recommendations and disseminates them, and all of that is coordinated at this central place. So, for example, I'm sorry, I didn't mean to. That's okay. Go ahead. You know, for example, the organization works through a series of committees, councils, and sections, they're called. These are basically groups of members who are familiar with a particular topic. Those folks get together, and they're the ones who come up with, okay, we study the literature, we make recommendations on behalf of this organization that speaks as a voice of doctor, so it has authority with policymakers and parents. That activity is coordinated through this headquarters, as are the healthy, you heard counsel say it's two employees who work on the healthychildren.org, three work on the website. You know, okay, those are the people who, that's their daily job, but the website brings in content from across the academy. But how can we include that as part of the charity that is done at this site? Well, so I, maybe I. I mean, if all your, if you have two people out of some 600 that are employed there, two people that are gathering this information from a variety of sites, one office, two people, is how do I extrapolate that into a primary use for a charity? I'm sorry, I may have misspoken. What I meant to say is, I think it's three, actually. Thank you for correcting me, Justice Hutchinson. I'll give you five. It's a small number of people. It's a small number of people who are like the webmaster, right? I mean, the people who are actually running the website. So that's what counsel was referring to when she said that. The content that goes into that website, however, you know, and what happened at trial was, the second witness was the CFO who went through literally a map of the property, floor by floor, and just testified about what happened there, and which committee and which part of the organization used each floor in each space. And what happens, so the website is a collection point for information that's developed by these committees, which are run by various other people in the organization. There's the outreach to the media. You know, they send out a weekly media mailer that has 1,000 recipients. That's what ended up this organization on CBS this morning. It's, you know, this organization is in the news any time you want to listen. It's all over the place. And the reason for that is the idea is to get information out to parents and other people. So all of that is coordinated through this one facility. That's where it happens. So the advocacy, yes, some of it occurs in Washington, but some of it, the president of the academy and the chief medical officer are both here in Itasca. Those people meet with, you know, all kinds of folks to lobby. They interface with federal agencies, as do many other people. So all of the product, the work product that occur, that, you know, that emanates from the academy comes from this space. That's where it all happens. Your position is members and non-members meet here to make recommendations, studies, et cetera, meetings, discussions, and then that just moves to a different floor and out it goes to the public in the proper channel. Right. Well, so just to make one, I want to make sure I'm clear about the records. I don't want to mislead anybody. The members don't always do their work by coming to the academy to meet. Sometimes they do. But, you know, not a large percentage of them come in any given year. My point is this is where it's all, but they do meet there. The chairs of the committees come to the academy to meet and there are other meetings that are held there. But the main thing is this is the coordination center for the whole operation. So it's all brought together at this one facility. And, yes, exactly right, Your Honor. The process of, okay, we now have a recommendation. One of the ones that was in the record at trial was about food additives. So we have a recommendation of, you know, what should or shouldn't be in food that children eat and all kinds of things that shouldn't be. But there was guidance about that. There was a formal policy that was issued. And then there was sort of a translation for laypeople of that policy that went out at the same time. There was a media announcement. People then were on CBS this morning. You know, that process all was coordinated. And all those people who manage all of that work at Itasca. So then you have the message getting out. And, of course, there's also a publication arm and a continuing medical education arm because, like the College of Surgeons, the Supreme Court case from the 60s, this is an organization that also educates doctors. If you want to address children's health, a really good way to do that is to speak to pediatricians. So the publications that are prepared, many of which are given away for free, the record shows that about $5 million of publications are given away for free. But much of it is for doctors who pay to be members as well. That is all a vehicle for educating the doctors who then meet with the parents. It's hard to reach a child directly because they're children. You can't go in and out and interface with them. So you want to reach their parents. You want to reach policymakers and doctors. The ones that are sold, we can't construe that to be charitable. Well, the sales themselves, obviously, are not charitable. I agree with you. But the organization is attempting to reach as many people as possible. One way to do that is, and also affect change. So one way to do that is to have periodicals that go to pediatricians that say this is how you should operate your practice. True, but that's not charity. Well, a lot of the input that goes into that information is contributed. True, but then you sell it. So it can't be both. Understood. Otherwise, you're making a profit off something that costs you nothing, and then you sell. Well, but then you're also taking, and they are making some money on publications. They are losing money in other areas. And the overall institution exists to sort of disseminate information. So that's one way to do it. My point is, you know, the fact that just as with the American College of Surgeons case, the fact that doctors are being educated is a good thing. It's not a bad thing. That's part of the purpose of the organization. And we want that to happen. And I know I'm over my time. I don't know if there are other questions that the Court has. No, I do not. Thank you, though, for answering. Justice Hudson? I do not. Thank you. Thanks very much. Appreciate it. And, counsel, thank you very much for your arguments this morning. No matter how long we are here listening to these, there's always something new to learn. And today was one of those circumstances, at least for me, and I assume for my colleagues as well. Thank you again for your arguments. We will issue a decision in due course. And we will now stand adjourned for today.